**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| MICHELLE ROMANO )<br>5607 Brookland Court )<br>Alexandria, Virginia  22310 )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>VERISIGN, INC. )<br>12061 Bluemont Way )<br>Reston, Virginia 20190 )<br> )<br>Serve:  CT Corporation System )<br>4701 Cox Road, Suite 285 )<br>Glen Allen, Virginia  23060 )<br> )<br>Defendant. )<br> ) | C.A. No. _____ |

## COMPLAINT

COMES NOW THE PLAINTIFF, MICHELLE ROMANO, by counsel, and moves this Court for entry of judgment in her favor, and against the Defendant, Verisign, Inc., and support of such motion alleges and avers as follows:

## NATURE OF ACTION

1.      This action states claims for discrimination and hostile work environment in the course of employment on the basis of gender and sexual orientation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* and the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

2.       This action also states claims of retaliation (including termination), in violation

Title VII of the Civil Rights Act of 1964, and the Virginia Human Rights Act, as amended in July

2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.,* after

Plaintiff complained about the discrimination and hostile work environment, and asked that action

be taken to protect her.

## PARTIES

3.       Plaintiff Michelle Romano ("Ms. Romano") is, and was at all times relevant

hereto, a resident and citizen of Fairfax County in the Commonwealth of Virginia, and at all times

relevant hereto, was employed by the Defendant in this judicial district.

4.       Defendant Verisign, Inc. ("Verisign") is a foreign (Delaware) corporation

registered to do business, and in good standing, in the Commonwealth of Virginia.

5.       Verisign is headquartered in Fairfax County (Reston) in this judicial district.

6.       Verisign is a global provider of domain name registry services and internet

infrastructure.

7.       Ms. Romano was an "employee" of Verisign within the meaning of 42 U.S.C. §

2000e(f).

8.       Verisign is an "employer" within the meaning of 42 U.S.C. §2000e(b).

9.       Verisign has had 15 or more employees for each working day in each of 20 or

more calendar weeks in the current or preceding calendar year, and was Ms. Romano's

"employer" within the meaning of Va. Code § 2.2-3905.

## JURISDICTION AND VENUE

10.      The amount in controversy in this action exceeds the jurisdictional minimum amount

for this Court.

11.     The causes of action alleged in this action arose in this judicial district, in Fairfax County, in the Commonwealth of Virginia.

12.     Ms. Romano is, and was at all times relevant hereto, a resident and citizen of this judicial district and at all times relevant hereto, was employed by the Defendant in this judicial district.

13.     Defendant is present in and conducts business in this judicial district, and the acts complained of herein occurred in this judicial district.  Therefore, the Defendant is subject to the personal jurisdiction of this Court.

14.     The unlawful employment practices in this case were committed in this judicial district, and Ms. Romano would still be employed in this judicial district, continuing to work for the Defendant, but for the Defendant's unlawful practices.

15.     This Court has jurisdiction over Ms. Romano's claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. and under Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq*.

16.     Defendant is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1331 and 1343(4).

18.     Jurisdiction and venue are proper in this Court.

## PROCEDURAL STATUS

19.     Ms. Romano timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("E.E.O.C."), and a Complaint of Discrimination with the with the Office of Attorney General - Virginia Office of Civil Rights, on July 21, 2021.  Pursuant

to the Worksharing Agreement between the two agencies, the OAG ceded investigative authority of Ms. Romano's Complaint to the E.E.O.C.

20.     The E.E.O.C. issued Ms. Romano a Right to Sue dated March 15, 2022.

21.     This action is timely filed.

## **BACKGROUND**

22.     Ms. Romano is a lesbian female.

23.     Ms. Romano began her employment with Verisign in September 2009 as a Channel Marketing Manager, reporting to Managing Director, Karla Hakasson.  At the time of her termination, Ms. Romano held the position of Director of Marketing Operations and Measurement.

24.     During the 2009 – 2012 time period, Ms. Romano performed well, garnering overall extremely positive reviews.  Ms. Romano received an overall rating of "3" (Satisfactory) for 2009 (with only three months on the job); an overall rating of "5" (Outstanding) for 2010 and 2011; and an overall rating of "4" (Exceeds Expectations) for 2012, while under the supervision of Karla Hakasson.

25.     On March 14, 2013, Ms. Romano received a promotion to Director of Channel Marketing, initially reporting to SVP Scott Schnell ("Mr. Schnell").  Ms. Romano was only given a 5% merit increase by Mr. Schnell when the usual increase provided for this type of promotion was 10%.  When Ms. Romano asked HR and Mr. Schnell why she had not received the expected 10% increase, she never received a straight answer and the 5% was not adjusted. Ms. Romano is aware of (heterosexual) male colleagues who were promoted and received the full 10% increase.

26.    In April 2013, Mr. Schnell hired Greg Malakoff ("Mr. Malakoff") as Channel Marketing Manager.  Mr. Malakoff was hired over the female candidate Ms. Romano had selected for the position, despite the fact that the new hire would be Ms. Romano's direct report.

27.    Mr. Schnell commented that the female candidate Ms. Romano wanted to hire was "the kind of girl you go have a beer with, not hire as a marketing manager."

28.    Ms. Romano began having performance issues with Mr. Malakoff almost immediately, and they persisted throughout his employment, increasing in severity.  Ms. Romano reported the issues to HR on numerous occasions over the years, but Mr. Malakoff was never subjected to any serious consequences.

29.    In December 2013, Ms. Romano received an overall rating of "3" from Mr. Schnell.  This was the lowest rating Ms. Romano had received since 2009, when she had only been on the job for three months and was still in a learning curve phase.  Mr. Schnell wrote that Ms. Romano needed to "moderate [her] "passion" and "step back."  On information and belief, Mr. Schnell did not tell Ms. Romano's  male colleagues to "moderate their passion."

30.    During the January – June 2014 time frame, Ms. Romano worked with her colleagues Joy Morel ("Ms. Morel") and Min Leone ("Ms. Leone") to create a presentation for Mr. Schnell to deliver to CFO George Kilgus ("Mr. Kilgus"). During the presentation to Mr. Schnell, Ms. Romano noticed that slides she had included were missing.  When Ms. Romano spoke up to ask about the missing slides, Mr. Schnell yelled and cursed at her, repeatedly, screaming in her face, "We don't "fucking need this!" and "George doesn't fucking need this!"

31.    A few days later, when her slides were not used in what Mr. Schnell presented to the CFO, Mr. Kilgus told Mr. Schnell it was not what he wanted.  When asked, Ms. Romano

presented the missing slides (which were on her laptop) and Mr. Kilgus said they were exactly what he was looking for.

32.     During a 1:1 meeting Ms. Romano requested with Mr. Schnell shortly thereafter, Ms. Romano spoke to him about his treatment of her and asked him to never speak to her in that manner again.

33.     During her 2014 mid-year review, Mr. Schnell told Ms. Romano to "be less alpha" and to "step back."  Mr. Schnell did not tell Ms. Romano's male colleagues to "be less alpha," and he did not make these same comments to her straight, female colleagues.

34.     Shortly after this, Ms. Morel, a colleague and direct peer of Ms. Romano's who is not gay, was promoted to Senior Director, becoming Ms. Romano's new manager.

35.     At the time of Ms. Morel's promotion she was managing Direct Marketing, and Ms. Romano managing Channel Marketing.  Once promoted, Ms. Romano's job and team were rolled under Ms. Morel.  Ms. Morel had no experience in Channel Marketing, openly admitted she did not know how to do what Ms. Romano does, and confided that she did not know why Ms. Romano was reporting to her.

36.     Later (when Ms. Romano was being investigated for being "disrespectful" to her supervisor), Ms. Romano discussed with HR her belief that Mr. Schnell's decision to promote Ms. Morel over her, and then requiring her to report to Ms. Morel (even when Ms. Morel admitted she did not know how to do Ms. Romano's job and did not know why Ms. Romano was reporting to her), shortly after Ms. Romano stood up to him and objected to his treatment of her, was clearly retaliatory.  HR's only response was that Ms. Morel's promotion was "already planned," and HR took no steps to investigate Ms. Romano's complaint of retaliation.

37.     In addition to promoting Ms. Romano's' direct peer over her, after Ms. Romano stood up to Mr. Schnell and objected to his treatment of her, telling him that he could not speak to her in such a disrespectful and unprofessional manner, Mr. Schnell started to treat Ms. Romano differently, including not meeting with her, and talking about her in a negative manner to Ms. Morel.

38.     Mr. Schnell began to circumvent Ms. Romano to work directly with her direct reports without involving either Ms. Romano or Ms. Morel.  Ms. Romano reported this to HR. This pattern of behavior by Mr. Schnell, and his attempts to undermine and disrespect Ms. Romano, and belittle her position and work product, continued throughout Ms. Romano's employment.

39.     In December 2014, Ms. Morel informed Ms. Romano that she had rated Ms. Romano a "4" (Exceeds Expectations) on her annual review, but Mr. Schnell would not approve the rating and lowered it to a "3" (Achieves).  Ms. Morel shared that Mr. Schnell often spoke about Ms. Romano in a negative and disparaging manner, both personally and as it related to her work.

40.     In April 2015, while working on a project with Ms. Morel, Ms. Morel once again told Ms. Romano that Mr. Schnell often (and continued to) speak about Ms. Romano to her in a negative and derogatory manner.  During this time Min Leone ("Ms. Leone"), Chief of Staff to Mr. Schnell, also started circumventing Ms. Romano when communicating with her team.

41.     In June 2015, Ms. Morel shared with Ms. Romano that her job and the stress caused by Mr. Schnell was making her physically ill, she could no longer tolerate Mr. Schnell's treatment of her and her team, and she was resigning as a result.  Ms. Morel again warned Ms. Romano about Mr. Schnell talking about her in a negative and disparaging manner.

42.    After Ms. Morel's departure, Ms. Romano once again reported directly to Mr. Schnell.  Despite her direct reporting line, Mr. Schnell did not conduct 1:1 meetings with Ms. Romano, and did not invite her to meetings he held with his team of direct reports.

43.    In June/July 2015, Min Leone was promoted to Senior Director, becoming Ms. Romano's new manager.  Mr. Schnell took this action after he asked for Ms. Romano's input and after Ms. Romano told him that Ms. Leone did not understand or have experience in channel marketing (Ms. Romano's job), and asked that she not be made to report to Ms. Leone since Ms. Leone did not understand Ms. Romano's job.

44.    Ms. Romano was far more qualified for the promotion Ms. Leone received.  Ms. Leone is not gay.

45.    Later during HR investigations, the HR reps were told by other finance, strategy and legal executives that Ms. Romano was a Subject Matter Expert reporting to someone (Ms. Leone) who was *not* a SME.

46.    Prior to this time, Ms. Romano had hired Lori Shepherd ("Ms. Shepherd") (an internal hire from the finance department) to her global channel marketing team.  When Ms. Romano asked to increase Ms. Shepherd's salary to the same level as her male colleagues on her team with the same title and responsibilities, the request was denied.  Ms. Romano continued to press, and at the end of the year Ms. Shepherd received a 10% increase, which still did not place her at the same salary level as her male colleague.

47.    In early 2016, Mr. Schnell wrote in Ms. Romano's 2015 end of year review (which he conducted instead of Ms. Leone, her manager) that Ms. Romano had "dominated" a meeting and in general, Ms. Romano needed to be "less dominant," and "Michelle is over dominant."   The meeting in question was one that Mr. Schnell had requested Ms. Romano

host/run.  Mr. Schnell did not tell male employees, or employees who are not lesbian women, to be "less dominant," especially in meetings they were running/hosting.

48.     Mr. Schnell gave Ms. Romano an overall rating of "3" and wrote "needs improvement" under the "values" section.

49.     Despite Ms. Romano sharing with Mr. Schnell comments made by the regional team that what she does "is an integral part in supporting strategy," Mr. Schell wrote in her review that Ms. Romano was a "road block to the regional VPs" and that there were "trust issues."  In addition, in the review, Mr. Schnell credited Ms. Romano's team with the success for Ms. Romano meeting her own personal goals, rather than giving any credit to Ms. Romano.

50.     In March 2016, Ms. Romano sent an email to HR questioning some of the comments made by Mr. Schnell in her review and providing proof to refute a demonstrably false negative comment that she had not met a contract deliverable.  As a result of Mr. Schnell's false allegation that Ms. Romano missed a deliverable deadline, Ms. Romano received a lesser bonus than she should have.  HR took no action to correct this.  Ms. Romano sent a second email later that month objecting to the many negative statements in her review which were completely subjective and not based on any facts, measurable goals, or her performance.  HR took no action to address her concerns, and instead pressured her to handle the situation with Mr. Schnell on her own, write down her comments, and "sign off" on the year-end review.

51.     Mr. Schnell also constantly questioned Ms. Romano about the job duties of her lower level, female marketing manager.  In response, Ms. Romano provided a detailed, written report of her responsibilities, tasks and deliverables, and verbally explained that what she did was imperative to the program's success.  Nevertheless, the position of Ms. Romano's female

marketing manager was eliminated within a month or two after Ms. Romano was moved to a new role and started reporting to Ms. Leone.

52.     Around that same time, Greg Malakoff ("Mr. Malakoff") was reported for rude and harassing behavior towards women.  Mr. Malakoff received both a verbal and written warning.  Prior to this, Ms. Romano had reported to the HR department and Mr. Schnell numerous performance and conduct issues with Mr. Malakoff, but little action was taken.  Ms. Romano was instructed to coach and train Mr. Malakoff and send him emails documenting the issues, with suggestions for improvement.  Despite this, Mr. Malakoff continued to be paid more than his female colleague, Lori Shepherd, and he later received a performance award, approved by Mr. Schnell.

53.     In May of 2016, Ms. Romano was summoned to the HR office and asked if she had photographs of her and her wife on display in her workspace (she did), and if she had photographs of her and her wife posted on her Facebook page (she does).  Ms. Romano explained that this was no different than her heterosexual colleagues displaying photographs of their own spouses.  When Ms. Romano asked why she was being questioned about this (since she had clearly been singled out based of her sexuality), she was told by the then-Senior Director of HR (now VP of HR), Heather Serice ("Ms. Serice"), that Ms. Romano did not want to be seen as "recruiting" anyone (to be gay).  Ms. Serice instructed Ms. Romano that she should not show any personal photographs on her computer to her colleagues or team.  Ms. Romano told HR that she was not "in the closet" and pointed out that some of her co-workers, including her manager at the time (Ms. Leone) had attended her wedding.  The HR managers appeared to be shocked and took notes when Ms. Romano told them who had attended her wedding.

10

54.     Ms. Romano told HR that she would not remove the photographs from her workspace.  Ms. Romano was aware that most of her co-workers at Verisign did not know she was gay until she got married in 2013.

55.     Shortly thereafter, also in May, Ms. Romano was written-up and investigated by HR, based on false allegations of being disrespectful to her manager and not following the Code of Conduct.

56.     In August 2016, several colleagues reported to Ms. Romano that they had observed her direct reports attending meetings in Mr. Schnell's office without Ms. Romano.  Ms. Romano was never notified or included in these meetings, or in the work being done.  Ms. Romano reported this to HR but received no response.  She even shared emails she had received from colleagues informing her that Mr. Schnell and his reports were going behind her back and undermining her with her employees, but still received no response.

57.     During the first quarter of 2017, Ms. Romano received an overall rating of "3" on her 2016 annual review, from Ms. Leone.  Ms. Romano received the lowest merit increase (1.5%) and the lowest RSU award grant given.  The initial rating was initially given to her with no written comments to support it, which Ms. Romano had to request.

58.     In contrast to the actions taken against Ms. Romano with no support for the allegations against her, Mr. Malakoff continued to exhibit poor performance, with no repercussions.

59.     In June 2017, Mr. Malakoff made some significant errors which were reported to Ms. Romano, as his supervisor.  Ms. Romano emailed Mr. Malakoff about correcting the errors and scheduled a meeting to discuss how best to do so.  During the meeting, Mr. Malakoff stood up and leaned over Ms. Romano's desk, pointing and screaming in her face.  When Ms. Romano

asked Mr. Malakoff to leave her office, he stood near her office door, holding it shut, yelling and waving his arms.  A male colleague overheard Mr. Malakoff yelling and came to check on Ms. Romano.  HR and Security were called and Ms. Romano's then supervisor was notified. Although Mr. Malakoff was removed from the building that day, he returned to work the following day.

60.    The next day when Ms. Romano informed HR that a male colleague had overheard the incident and feared for her safety, HR (Heather Serice) responded that since the incident took place behand closed doors, they "don't really know who said what or what really happened."  No further action was taken despite the fact that in the months prior, Ms. Romano had shared with HR other instances where Mr. Malakoff had been warned about his aggressive and threatening behavior with others in the office, and that he had received a written warning (one employee even asked that Mr. Malakoff never come to his office again).

61.    Shortly thereafter, Ms. Romano was informed by several other employees and colleagues that Mr. Malakoff was boasting around the office that he had put Ms. Romano "in her place," and making inappropriate, derogatory, discriminatory, homophobic and anti-gay comments.  These colleagues expressed concern for Ms. Romano's safety, telling her that Mr. Malakoff was watching for her motorcycle to see when she arrived or left the building.  These same colleagues told Ms. Romano that they reported their concerns for her safety, and the things Mr. Malakoff had been saying and doing, to HR.  Ms. Romano also sent an email to HR with the same details.  In response, Ms. Romano was told by HR that they were deciding how to handle the situation, but that Mr. Malakoff would continue reporting to her in the meantime.

62.     Ms. Romano followed up with HR in July 2017 but still no action was taken, and Ms. Romano was tasked with conducting Mr. Malakoff's mid-year review, since despite his conduct towards her, the reporting line had not changed, and he still reported to her.

63.     In August 2017 Ms. Romano emailed HR again, stating that her colleagues remained fearful for her safety, and that she was having to vary her entry route into the building for her own protection.

64.     On September 5, Ms. Romano sent an email to Ms. Serice/HR requesting help concerning her mid-year review.  Ms. Romano's then supervisor provided her with a positive review in person (orally), but then entered negative comments in the Verisign review system that were never shared with Ms. Romano, and which were demonstrably false.

65.     Also in September 2017, HR informed Ms. Romano that she would still be required to manage Mr. Malakoff's work (and fix his mistakes), and that she would still be required to meet with him in person to do so.  The "investigation" into his violent outburst toward Ms. Romano remained open at that time.

66.     Shortly thereafter, Ms. Romano was informed that Mr. Malakoff had received a written warning regarding his "recent behavior" and that there is "no real proof" of what happened since it occurred behind closed doors.  When Ms. Romano asked why he had not been fired, she was told they were required to give him a written warning first.  HR was aware that Mr. Malakoff had received a written warning for aggressive behavior previously.  Despite this, no further action was taken, and Mr. Malakoff remained under Ms. Romano's supervision.

67.     On October 9, 2017, Ms. Romano sent an email to Ms. Serice in HR, informing Ms. Serice that the "Conflict in the Workplace" course she had just completed included a training video with examples of anti-gay remarks (identified as inappropriate and discriminatory

workplace conduct).  Ms  Romano expressed her surprise given how she had been questioned

and admonished by HR about displaying photographs with her wife, her "gay lifestyle," and had

been told by HR that she [Ms. Romano] did not want to appear that she was "recruiting" her co-

workers to be gay.  Ms. Serice's only response was to say, "Thanks, Michelle - I will review the

video as I don't believe I've seen this one yet."

68.     Also in October 2017, Ms. Romano was moved to a new role – Director of

Marketing Operation and Measurement, reporting to Don Chapman, a Vice President.  Ms.

Romano did not receive any pay increase, even though this new role had a higher pay scale, and

her current salary level was less than the pay scale for her new position.

69.     Throughout this time, and into the year, Ms. Romano continued to support her old

role, while asking that the newly promoted managers take responsibility for managing the role

Ms. Romano had vacated.  Ms. Romano never received any additional credit or compensation for

continuing to support her old position, while simultaneously performing her new role (while

being paid less than she should have been).

70.     In October 2018, Ms. Romano was selected for a 360 evaluation.  Ms. Romano

requested of HR that Mr. Schnell and her supervisor not be included, knowing they would

intentionally provide false and negative feedback and skew the results, based on their hostility

towards her.   This request was denied.

71.     As of November/December 2018 Ms. Romano was once again reporting to Mr.

Schnell.  Nevertheless, he did not include her in any direct report meetings, and he did not

schedule any 1:1 meetings with her.  As a result, Ms. Romano met with HR (Ms. Serice) and

followed up in emails regarding Mr. Schnell's continued discriminatory and retaliatory behavior

towards her.  Ms. Romano again objected to Mr. Schnell's and Ms. Leone's participation in her 360 review since the results would not be accurate.

72.     On November 21, 2018, Ms. Romano sent an email to Ms. Serice to follow-up and/or acknowledge discussion points from their meeting the day before, including her concerns of continuing and further retaliation by Mr. Schnell, the obstacles he created in order to prevent her from successfully preforming her job, and again objecting to Mr. Schnell and others being appointed as scoring participants in her 360 review.

73.     On November 28,  2018, Ms. Romano sent an email Ms. Serice letting her know that she had been excluded from Mr. Schnell's weekly meeting of direct reports, despite the fact that she was now his direct report.  Ms. Romano told Ms. Serice, "Yet another example, per our discussion last week.  And this is **for you only please.**  *I am very fearful if you share with Scott it will be wounding,* not helpful for me" (emphasis in the original).

74.     Ms. Romano received her end of year review from Mr. Chapman – an overall rating of "4" (Exceeds Expectations).

75.     In January 2019, Ms. Romano complained to HR that Mr. Schnell had changed a "4" rating Ms. Romano had given to one of her female direct reports, to a "3," once again undermining Ms. Romano's authority with her team.

76.     In the January/February 2019 time frame, a female colleague, Deanna Alvy, shared that she, too, experienced issues with Mr. Schnell's harassing conduct, commenting, it is "because we are both strong women, and he has a problem with that."

77.     As of March of 2019, as she had in prior roles, Ms. Romano was receiving compliments from many of the SVPs, VPs, and Senior Directors about the great work she was doing in her new role.

78.     In March 2019, during a presentation Ms. Romano was required to make by Mr. Schnell to the entire direct report team, Mr. Schnell interrupted her presentation by putting his hand up, told her to "stop talking," and instructed her colleague, F'lynne Didenko, to continue the presentation.  Ms. Didenko spoke briefly, and then stated that the majority of the work, and the presentation, had been done by Ms. Romano.  Ms. Romano was then allowed to continue.

79.     On March 13, 2019, Ms. Romano sent an email to Ms. Serice regarding Diversity and Inclusion Programs.  She wrote:

> Given the recent accusations by [Jen Walther] and past questioning about me and my personal marriage,  I think it would be very helpful if we introduced a Diversity and Inclusion Program and education to VRSN.  I am confident that if I were in a heterosexual marriage, this type of allegation and criticism would have been obsolete.  It seems there is a mis-understanding and probable discrimination in our work place in regards to LGBTQ issues.  A Diversity and Inclusion Program will help combat bias in work relationships, recruiting and leadership in the workplace.  It also helps foster an inclusive culture and improves team engagement. . . . . glad to be part of the group or be a mentor  or help organize with our HR group.

80.     Around this same time, Ms. Romano sent an email to HR (Ms. Serice and Mr. Rowson) letting them know that Ms. Waltham – the employee who falsely accused Ms. Romano about talking about "gay sex" with her wife, was now asking Ms. Romano questions about her and her wife. Ms. Romano wrote that while under "normal" circumstances she would think nothing of it, given the investigation and Ms. Waltham's accusations, her inquiries were inappropriate (and could be an attempt to fabricate further allegations of Ms. Romano discussing her "gay" lifestyle).

81.     Ms. Romano also emailed Ms. Serice and Mr. Rowson to report that Ms. Waltham had walked into her office and leaned over Ms. Romano's desk to look at Ms. Romano's computer screen.  Given the recent accusations and admonishment that Mr. Romano should not show any photographs on her computer to any co-workers, Ms. Romano told Ms.

Serice and Mr. Rowson that she would prefer not to meet with Ms. Waltham without a witness present, as she did not want to create any further opportunities for false allegations to be made against her (particularly by someone seeking  promotion to Ms. Romano's role).

82.    Also in March, Ms. Romano emailed HR asking about the rumors that Mr. Reed would be promoted to Senior Director (of the department where Ms. Romano was then a Director), and inquiring if the change would create an available role she could apply for.  HR would not discuss the issue with her.  Mr. Reed subsequently received the Senior Director role, to lead what Ms. Romano was already successfully doing.  Ms. Romano was not given the opportunity to apply for the role.

83.    On April 8, 2019, Ms. Romano received a write-up for telling her employee, Jen Walther, that Ms. Romano had rated her a "4," but that Mr. Schnell had downgraded it to a "3." Ms. Romano was aware of several other managers and directors who shared similar information with their direct reports (that the SVP did not sign off on the rating), who were not written up or disciplined for doing the same thing Ms. Romano did (including Mr. Chapman, who told Ms. Romano he rated her a "4," but Mr. Schnell downgraded it to a "3").  Unlike Mr. Chapman, Ms. Romano was found to have violated the Standards of Conduct.

84.    In addition, Ms. Romano was also informed by HR that she was under investigation as the result of an (alleged) ethics line complaint against her for talking about having "gay sex" with her wife "all over [her] house."  The write-up stated that she had been accused of making people "uncomfortable by saying inappropriate things of a sexual nature," but that the investigation had concluded that there was "no corroborating evidence that [she] made any sexually explicit statements."  Ms. Romano was incredulous – the allegations, aside from

being false – were ridiculous.  Ms. Romano is not aware of any heterosexual employee who was ever investigated for talking about having sex with his or her spouse.

85.     Ms. Romano refused to sign the write-up, which was based on false allegations against her.

86.     On April 11, 2019, after receiving the write-up, Ms. Romano emailed Ms. Serice and provided specific facts to refute the false allegations against her, requested more specifics as to the allegations, and asked to see the specific guidelines and/or policies for performance management that prohibited her from discussing ratings with an employee at end of year, prior to management approval of the rating, saying, "I searched everywhere and cannot find it."  HR was unable to provide any policy Ms. Romano violated, despite her request.  HR said it was not policy, just "common practice," and did not rescind the write-up.

87.     During this conversation, Ms. Romano told HR that she was forced to endure a hostile work environment on a daily basis.  Ms. Romano again asked  to "revisit" the idea of Verisign creating a Diversity and Inclusion Program.

88.     However, after that, Ms. Romano received multiple write-ups for fabricated allegations such as a false allegation that she stormed out of a meeting.  Ms. Romano refused to sign the warning and told HR, in the presence of Ms. Schnell, that it was shameful that HR continued to allow Mr. Schnell to retaliate against her and create a false paper trail in order to justify her eventual termination.

89.     Within one month of the meeting with HR, Ms. Romano suggested to Mr. Reed that they meet with the internal audit team to revisit some work they were doing to support an external audit.  In response, Mr. Reed told her, "the audit team never wants to meet with you again and I'm pretty sure it has everything to do with the head of audit knowing about the

18

investigation of the sexual comments" (referring to the false accusations that Ms. Romano talked about having "gay sex" with her wife "all over the house").   Ms. Romano was shocked and completely taken aback by Mr. Reed's comment, and his willingness to condone the behavior.

90.     Not only was Mr. Reed condoning the audit team's refusal to work with her based on false and discriminatory reasons, but his comment also demonstrated that Verisign had knowledge of management's ratification and participation in the hostile and discriminatory conduct since Mr. Reed and others were openly discussing what should have been a confidential investigation.

91.     Ms. Romano also pointed out that prior to Mr. Schnell becoming her manager, in 9 out of 10 years, she had achieved, exceeded, or was outstanding in the values/code of conduct category, and that Mr. Schnell, with the help of others reporting to him, was setting her up for termination.  In a follow up meeting with Paul Rowson ("Mr. Rowson") of HR, Mr. Rowson asked, "Why don't you just quit?" Ms. Romano asked Mr. Rowson why she should be the one to quit and affirmed that she would continue to defend herself.  After that, HR assigned Ms. Romano an executive coach.

92.     On April 15, 2019, Ms. Romano received an email from Ms. Serice letting her know that Verisign had identified three potential executive coaches for her to choose from.  Ms. Romano responded, thanking Ms. Serice and Mr. Rowson for listening to her concerns, and stating she was looking forward to the upcoming coaching providing an unbiased viewpoint of what she had been experiencing.

93.     During a subsequent call, Ms. Serice explained that one potential coach has a gay child, one is a gay man, and the other is an African American woman.  Ms. Romano thanked Ms. Serice and explained that whether a coach is gay or has a gay child had nothing to do with

executive coaching, since they were not coaching her on being gay.  Ms. Romano told Ms. Serice

that she would select the best coach for her based on the phone conversations/interviews she

would have with them, which she did.

94.     Notably, the executive coach that was hired by Verisign concluded that from his

review of the 360 evaluation, it was clearly biased with negative intended comments by one or

two people.

95.     In June/July 2019, Ms. Romano offered for the second time, to start a diversity

group at Verisign.  Ms. Romano emailed Heather Serice in July about an "Out and Equal

Workplace" Summit in Washington, D.C. scheduled for October and recommended someone

from HR attend (Ms. Romano also volunteered to attend).  Throughout her tenure Ms. Romano

made several offers to start some type of Diversity, Equity, and Inclusion program, but Verisign

never took her up on the offer.

96.     In August 2019, as part of her executive coaching exercise, Ms. Romano met with

Pat Kane ("Mr. Kane"), a Senior VP, for feedback on what improvements she needed to make.

Mr. Kane stated that to his knowledge, he could not think of anything Ms. Romano needed to

improve upon, that she had one of the best work ethics he had seen, was strategic,

straightforward and had integrity.  Mr. Kane openly shared that her issues with Mr. Schnell were

the fault of Mr. Schnell, and should not be attributed to Ms. Romano or her performance.

97.     During August/September 2019 Ms. Romano sought counseling via the Verisign

Employee Assistance Program on four separate occasions.  The counselor concluded that her

stress and distress was completely attributed to her work environment.

98.     In January 2020, Mike Reed screamed at Ms. Romano over the phone when she

provided requested feedback and recommendations, when they were not the suggestions he had

wanted to hear.  Later, in May 2020 (when nothing else had worked), Mr. Reed instructed Ms. Romano to implement the very recommendations he had yelled at her about.  This was not an isolated incident.

99.     In March 2020, Mr. Reed delivered Ms. Romano's 2019 end of year review, which was replete with negative comments.  To refute it, Ms. Romano provided full detailed milestones of what she had delivered, since she had been downgraded for allegedly not completing tasks which were clearly identified as "complete" in the system.

100.    In April 2020 Ms. Romano had a met with Ms. Serice in HR to conclude her executive coaching exercise.  The Coach (Jim) shared his opinions and conclusions that Ms. Romano was "underutilized" and was "one of the most coachable people he had ever had the pleasure to coach."  He stated that Ms. Romano was willing to listen and put in the work needed, but shared concerns that her mangers had been inconsistent with goals and bonus policy towards her.  The Coach also told the HR team he had declined to conduct another 360 review as they requested since it would likely result in the same skewed outcome with the inclusion of specific managers who had been targeting Ms. Romano.  In the meeting, Ms. Romano informed HR that she had sought counseling on four separate occasions from the Employee Assistance Program about the stress and distress caused by her Verisign's treatment of her.

101.    In June 2020, Ms. Romano sent HR a long list of recent compliments she had received from various teams and colleagues, to illustrate the overall positive perception of her work.  She did not receive any response.

102.    In August 2020, after months of asking, Ms. Romano finally received feedback from Mr. Reed on the 2020 goals she had submitted, along with her mid-year review.  Ms. Romano's goals were never finalized by her manager.

103.     In October 2020 Ms. Romano sent Jacqueline Conrad ("Ms. Conrad") a note congratulating her on her promotion to senior vice president of the law department.  Ms. Conrad thanked Ms. Romano and asked how she was doing.  Ms. Romano replied that she was still working with Mike Reed and Scott Schnell, and said if Ms. Conrad needed an EA in her new role, Ms. Romano was for hire.  Ms. Conrad replied, "But if you left, who would keep them in line?"

104.     In the first few months of 2021, Ms. Romano's mother-in-law died from COVID.  Her co-workers joked that, "I guess COVID is over now since Trump is no longer in office."  This comment was particularly insensitive and inappropriate since Mr. Reed was aware that Mr. Romano's wife's mother had died from COVID.  Nobody from Verisign sent so much as a card or flowers (despite Mr. Reed commenting, "Oh, my wife told me I should send you flowers or something"), in stark contrast to how heterosexual employees were treated after a death in the family.

105.     Ms. Romano received an overall rating of "3" for her 2020 end of year review.

106.     For the previous three years, Mr. Reed failed to set proper goal assignments or conduct proper reviews, in accordance with company policy.  Ms. Romano also worked with the HR Goals manager, Heidi Clark ("Ms. Clark"), who agreed that Ms. Romano was not given "SMART" goals in 2020, and Ms. Romano worked with Ms. Clark, to write the goals for 2021, which Mr. Reed had to be forced to review.  Ms. Romano was left feeling like she was in a "no win" situation and that Mr. Reed's goal was to create a negative paper trail in order to justify her eventual termination, since Mr. Reed's feedback that she was not meeting goals, while knowing she did not have measurable and definable goals to meet.  Furthermore, Ms. Romano had been told by Mr. Reed and Mr. Schnell that her goals should "be open."  This was contrary to the

company's SMART goal policy, and Mr. Reed and Mr. Schnell failed to set SMART goals for Ms. Romano, and told her that her goals should "be open" so that there would be no Specific, Measurable, Achievable, Relevant, or Time Bound goals for Ms. Romano (which she would meet or exceed), and so they could justify her termination for not meeting the "open," arbitrary, and ambiguous goals they determined to measure her by.

107.    Ms. Romano had participated in SMART Goals training in 2020 (Specific, Measurable, Achievable, Relevant, Time Bound) and worked with Ms. Clark to assist writing SMART goals.  Ms. Clark coach observed that Ms. Romano's prior years' goals were not "SMART."  Later in a private conversation with Ms. Romano, Ms. Clark confided that she was directed not to assist Ms. Romano without alerting Ms. Serice and letting her know what she was doing to help Ms. Romano.

108.    When Ms. Romano explained to Mr. Reed that she had worked with Ms. Clark to write goals, he expressed his displeasure and accused Ms. Romano of having an ulterior motive for doing so.

109.    In March 2021, Verisign sent out a "Diversity and Inclusion" survey and hired a third-party company to interview employees about diversity practices at Verisign.  As part of the survey, employees were grouped in categories of "White women," "African Americans," "India Indians," "White men," "single white women," "women over 40."  Ms. Romano and Alys Fraser, who is also gay, were placed in the same sample group.

110.    Notably, Ms. Fraser's wife, Chris (also a Verisign employee) was also reported for displaying photographs of her and her wife, Ms. Fraser, in her office.

111.     Ms. Romano has  been told that a staff person in the law department was overheard to say, "Can't stand that dyke on the motorcycle."  Ms. Romano believes this comment was made about she, since she drives a motorcycle.

112.     After the survey came out, Ms. Romano emailed HR (newly named SVP Ellen Petrocci) to thank her for finally taking the first steps towards addressing diversity in the workplace.  Ms. Romano once again volunteered to spearhead a diversity program of some kind internally, telling Ms. Petrocci that she had made this offer several times in the past.  Ms. Romano did not receive a response other than "thank you."

113.     In April 2021, as had been the case for the previous three years and as described above, Ms. Romano still did not have her goals from her manager as mid-year approached.  Ms. Romano reached out to Paul Rowson in HR to discuss this further, but he said he did not have time.

114.     On the morning of May 4, 2021, Ms. Romano received a calendar invite from Mr. Rowson, which she assumed was to finally discuss the continued issues surrounding not yet having her goals finalized.  Ms. Romano noticed that Ebrahim ("Eb") Keshavarz ("Mr. Keshavarz"), SVP of Product, was also invited, which Ms. Romano thought was in error.

115.     When Mr. Keshavarz joined the call, he informed Ms. Romano that based on a recent reorganization, he would now be leading accounting and marketing, and her position was eliminated.

116.     When Ms. Romano asked Mr. Keshavarz if there were any positions she could be considered for instead of being eliminated, Mr. Rowson stopped him from responding.  Mr. Keshavarz then simply stated that Ms. Romano would have the opportunity to apply for any new positions that posted externally.

117.     Ms. Romano has since learned that several new director and senior director level positions were opened and filled after only being posted internally.  Ms. Romano is also aware that several people were promoted in the marketing group (whereas Ms. Romano's role was cut as an "eliminated position"), including Jenn Walther who was Ms. Romano's non-gay direct report employee.  Ms. Walther was promoted in 2021/early 2022.

118.     Scott Schnell and Min Leone, whose positions were also impacted by the reorganization, were extended through the summer to transition, to allow them to receive vesting stock options in August, and additional bonuses.  Ms. Romano, on the other hand, received notice that her forthcoming RSU grants had all been cancelled.

## COUNT ONE -
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT DURING THE COURSE OF EMPLOYMENT IN VIOLATION OF TITLE VII

119.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

120.     Defendant discriminated against Ms. Romano, treated Ms. Romano in a disparate manner, and subjected Ms. Romano to a hostile work environment because of her sexual orientation and gender (female).

121.     Acts of discrimination include:

- Failing to promote Ms. Romano;

- Awarding Ms. Romano only a 5% increase instead of the usual 10% increase give to others when she was promoted to Director of Channel Marketing;

- Mr. Schnell writing in Ms. Romano's 2013 review that she should "moderate [her] "passion" and "step back;"

- Mr. Schnell yelling and cursing at Ms. Romano in meetings and devaluing her input;

- Mr. Schnell telling Ms. Romano during her 2014 mid-year review to "be less alpha" and to "step back;"

- Mr. Schnell commenting in Ms. Romano's 2015 end of year written that Ms. Romano had "dominated" a meeting (which she had been asked to host/run) and stating that in general, Ms. Romano needed to be "less dominant," and writing, "Michelle is over dominant;"

- Mr. Schnell giving Ms. Romano an overall rating of "3" and writing "needs improvement" under the "values" section of the review (before Mr. Schnell became her manager, in 9 out of 10 years, Ms. Romano had achieved, exceeded, or was outstanding in the values/code of conduct category;

- Mr. Reed and Mr. Schnell failing to provide measurable and defined goals for Ms Romano, and then downgrading her for not meeting her goals;

- Mr. Schnell crediting Ms. Romano's team with the success for Ms. Romano's own personal goals, rather than giving any credit to Ms. Romano;

- HR summoning Ms. Romano to a meeting in May 2016 and asking if she had photographs of her and her wife on display in her workspace (she did), and if she had photographs of her and her wife posted on her Facebook page (she does);

- Telling Ms. Romano, when Ms. Romano questioned why she was being asked about her photographs and explaining that this was no different than her heterosexual colleagues displaying photographs of their own spouses, that Ms. Romano did not want to be seen as "recruiting" anyone (to be gay);

- Mr. Reed telling Ms. Romano that "the audit team never wants to meet with you again and I'm pretty sure it has everything to do with the head of audit knowing about the investigation of the sexual comments" (referring to the false accusations that Ms. Romano talked about having "gay sex" with her wife "all over the house");

- Asking Ms. Romano, "Why don't you just quit" when she pointed out that in 9 out of 10 years, she had achieved, exceeded, or was outstanding in the values/code of conduct category, before Mr. Schnell became her manager;

- Selecting executive coaches for Ms. Romano to choose from based on sexual orientation (a gay man, and one with a gay child), which, as Ms. Romano was forced to explain, had no merit since she was not being coached on how to be gay;

- Ignoring and/or not accepting Ms. Romano's offer to start a diversity group at Verisign;

26

- Ignoring Ms. Romano's suggestion that someone from HR attend an "Out and Equal Workplace" Summit in Washington, D.C.;

- Incentivizing other employees with RSUs to stay at Verisign while not similarly incentivizing Ms. Romano;

- Mr. Reed telling Ms. Romano, after Ms. Romano's wife's mother had died from COVID, "Oh, my wife told me I should send you flowers or something" (which did not happen), which was in stark contrast to how heterosexual employees were treated after a death in the family;

- Placing Ms. Romano and Alys Fraser (also gay) in the same sample group for a "Diversity and Inclusion" survey; and

- A staff person in the law department commenting, "[I] Can't stand that dyke on the motorcycle."

122.    Non-gay employees and male employees were not subjected to similar treatment.

123.    Defendant's discriminatory treatment of Ms. Romano violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

124.    In discriminating against Ms. Romano in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Romano .

125.    As a direct and proximate result of Defendant's actions, Ms. Romano has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, depression, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

126.    Due to the conscious disregard for Ms. Romano's federally protected rights, and the severity of Defendant's conduct, Ms. Romano is also entitled to punitive damages.

## COUNT TWO –
## RETALIATION AND TERMINATION IN VIOLATION OF TITLE VII

127.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

128.    Ms. Romano was vocal in her objections to the discriminatory treatment to which she was subjected based on her gender and sexual orientation, including making verbal complaints to Mr. Perrelli and Ms. Nugent on multiple occasions, and a formal, written complaint to Ms. Perrelli in Talent (HR).  Mr. Jenks (CEO) and Mr. Crone (COO) were also informed of Ms. Romano's complaints by Ms. Perrelli.

129.    Ms. Romano reported and complained about discrimination on several occasions throughout her employment, starting in 2014 when she objected to Mr. Schnell's treatment of her.  After Ms. Romano stood up to Mr. Schnell and told him he could not treat her in that manner, Verisign (including through Mr. Schnell) retaliated against Ms. Romano.

130.    Thereafter, Ms. Romano was subjected to a continuing course of retaliation for her complaints about the discriminatory and hostile treatment to which she was subjected.

131.    Acts of retaliation included:

- Promoting Joy Morel, Ms. Romano's direct peer who is not gay, over Ms. Romano and making her Ms. Romano's new manager, even when Ms. Morel openly admitted she did not know how to do what Ms. Romano did, and confided that she did not know why Ms. Romano was reporting to her;

- Mr. Schnell no longer meeting with Ms. Romano;

- Mr. Schnell talking about Ms. Romano in a negative manner to Ms. Morel;

- Mr. Schnell and others circumventing  Ms. Romano and working directly with her direct reports without involving either Ms. Romano or Ms. Morel  (which Ms. Romano reported to HR and asked that it stop);

- Refusing to approve Ms. Morel's "4" rating (Exceeds Expectations) on Ms. Romano's annual review, and lowering it to a "3" (Achieves);

- Mr. Schell encouraging his Chief of Staff, Min Leone, to circumvent Ms. Romano and communicate with her team behind Ms. Romano's' back;

- Mr. Schnell failing and/or refusing to conduct 1:1 meetings with Ms. Romano, including at times when Ms. Romano was in Mr. Schnell's direct reporting line;

- Mr. Schnell excluding Ms. Romano from meetings he held with his team of direct reports;

- Mr. Reed and Mr. Schnell failing to provide measurable and defined goals for Ms Romano, and then downgrading her for not meeting her goals;

- Mr. Schnell promoting Min Leone to Senior Director (and Ms. Romano's new manager, despite Ms. Romano being more qualified for the position) after asking for Ms. Romano's input and after Ms. Romano told him that Ms. Leone did not understand or have experience in channel marketing (Ms. Romano's job), and asked that she not be made to report to Ms. Leone since Ms. Leone did not understand Ms. Romano's job;

- HR refusing to correct or adjust the amount of Ms. Romano's bonus which had been based on a demonstrably false comment by Mr. Schnell that Ms. Romano had missed a deliverable, and taking no action to address Ms. Romano's written complaint, and instead pressuring her to handle the situation with Mr. Schnell on her own, write down her comments, and "sign off" on the year-end review; and

- Refusing to approve Ms. Romano's requests to travel to meet with the European team for an in-person workshop program.

132.    Ms. Romano was subjected to further retaliation when, after she was summoned to HR in May 2016 and asked whether she displayed and posted pictures of her and her wife, and was admonished that she did not want to be viewed as "recruiting" people to be gay, she told HR that her photos were no different than her heterosexual co-workers displaying or posting pictures with their spouse, and refused to take them down.

133.    Subsequent, and further, retaliation included:

- Subjecting Ms. Romano to a write-up and HR investigation based on false allegations of being disrespectful to her manager and not following the Code of Conduct;

- Changing Ms. Romano's working hours, which had been arranged years ago to allow her to accommodate early morning meetings with the international teams;

- Micromanaging Ms. Romano while simultaneously telling her to "own everything;"

- Subjecting Ms. Romano to undue scrutiny and blaming Ms. Romano for errors that were clearly not hers;

- Excluding Ms. Romano from meetings held with her direct reports in Mr. Schnell's office, and not informing Ms. Romano of the meetings or the work being done;

- HR failing to acknowledge or address Ms. Romano's complaints of being excluded and undermined with her direct reports;

- Awarding Ms. Romano the lowest merit increase (1.5%) and the lowest RSU award grant given for her 2016 annual review;

- Failing to properly address or investigate Mr. Malakoff's aggressive and threatening behavior toward Ms. Romano, and failing to take any steps to protect Ms. Romano after being on notice that Mr. Malakoff was boasting around the office that he had put Ms. Romano "in her place," was making inappropriate, derogatory, discriminatory, homophobic and anti-gay comments, and was watching for Ms. Romano's motorcycle to see when she arrived or left the building;

- Requiring Ms. Romano to remain as Mr. Malakoff's supervisor and interact with him despite his aggressive behavior and threats against her;

- Failing to adjust Ms. Romano's salary when she was moved to a new role (Director of Marketing Operation and Measurement) with a higher pay scale (and when her current salary level was less than the pay scale for her new position), despite her requests and follow-up; and

- Selecting Ms. Romano, in October 2018, for a 360 evaluation and denying her request that Mr. Schnell and Ms. Leone not be included.

134.    In or around November/December 2018, Ms. Romano again reported the continuing discriminatory and retaliatory behavior towards her.

135.    Subsequent, continuing acts of retaliation included:

- Mr. Schnell unilaterally changing a "4" rating Ms. Romano had given to one of her female direct reports, to a "3," once again undermining Ms. Romano's authority with her team;

- Subjecting Ms. Romano to a written write-up for telling her employee that Mr. Schnell had downgraded her rating, when others were not similarly written-up for the same conduct;

- Investigating Ms. Romano as the result of an (alleged) ethics line complaint against her for talking about having "gay sex" with her wife "all over [her] house;"

- Subjecting Ms. Romano to multiple write-ups for fabricated allegations such as a false allegation that she stormed out of a meeting;

- Requiring Ms. Romano to work with an executive coach after Ms. Romano stated she would not quit or back down from defending herself; and

- Terminating Ms. Romano and not extending her employment through the summer (as Verisign did for others, such as Scott Schnell and Min Leone in order to allow them to receive vesting stock options and additional bonuses) and cancelling Ms. Romano's forthcoming RSU grants.

136.    Verisign's retaliation is in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*.

137.    This conduct by Defendant was actuated by malice, spite, and ill-will; was willful and wanton, and evinced conscious disregard for the rights of Ms. Romano .

138.    As a direct and proximate result of Defendant's actions, Ms. Romano has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, depression, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

139.    Due to the severity of Defendant's conduct, Ms. Romano is also entitled to punitive damages.

**COUNT THREE –**
**DISCRIMINATION AND HOSTILE WORK ENVIRONMENT**
**IN THE COURSE OF EMPLOYMENT IN VIOLATION OF THE**
**VIRGINA HUMAN RIGHTS ACT/VIRGINIA VALUES ACT**

140.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

141.    Defendant discriminated against Ms. Romano, treated Ms. Romano in a disparate manner, and subjected Ms. Romano to a hostile work environment because of her sexual orientation and gender (female), in violation of Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

142.    Acts of discrimination include:

- Failing to promote Ms. Romano;

- Awarding Ms. Romano only a 5% increase instead of the usual 10% increase give to others when she was promoted to Director of Channel Marketing;

- Mr. Schnell writing in Ms. Romano's 2013 review that she should "moderate [her] "passion" and "step back;"

- Mr. Schnell yelling and cursing at Ms. Romano in meetings and devaluing her input;

- Mr. Schnell telling Ms. Romano during her 2014 mid-year review to "be less alpha" and to "step back;"

- Mr. Schnell commenting in Ms. Romano's 2015 end of year written that Ms. Romano had "dominated" a meeting (which she had been asked to host/run) and stating that in general, Ms. Romano needed to be "less dominant," and writing, "Michelle is over dominant;"

- Mr. Schnell giving Ms. Romano an overall rating of "3" and writing "needs improvement" under the "values" section of the review (before Mr. Schnell became her manager, in 9 out of 10 years, Ms. Romano had achieved, exceeded, or was outstanding in the values/code of conduct category;

32

- Mr. Reed and Mr. Schnell failing to provide measurable and defined goals for Ms Romano, and then downgrading her for not meeting her goals;

- Mr. Schnell crediting Ms. Romano's team with the success for Ms. Romano's own personal goals, rather than giving any credit to Ms. Romano;

- HR summoning Ms. Romano to a meeting in May 2016 and asking if she had photographs of her and her wife on display in her workspace (she did), and if she had photographs of her and her wife posted on her Facebook page (she does);

- Telling Ms. Romano, when Ms. Romano questioned why she was being asked about her photographs and explaining that this was no different than her heterosexual colleagues displaying photographs of their own spouses, that Ms. Romano did not want to be seen as "recruiting" anyone (to be gay);

- Mr. Reed telling Ms. Romano that "the audit team never wants to meet with you again and I'm pretty sure it has everything to do with the head of audit knowing about the investigation of the sexual comments" (referring to the false accusations that Ms. Romano talked about having "gay sex" with her wife "all over the house");

- Asking Ms. Romano, "Why don't you just quit" when she pointed out that in 9 out of 10 years, she had achieved, exceeded, or was outstanding in the values/code of conduct category, before Mr. Schnell became her manager;

- Selecting executive coaches for Ms. Romano to choose from based on sexual orientation (a gay man, and one with a gay child), which, as Ms. Romano was forced to explain, had no merit since she was not being coached on how to be gay;

- Ignoring and/or not accepting Ms. Romano's offer to start a diversity group at Verisign;

- Ignoring Ms. Romano's suggestion that someone from HR attend an "Out and Equal Workplace" Summit in Washington, D.C.;

- Incentivizing other employees with RSUs to stay at Verisign while not similarly incentivizing Ms. Romano;

- Mr. Reed telling Ms. Romano, after Ms. Romano's wife's mother had died from COVID, "Oh, my wife told me I should send you flowers or something" (which did not happen), which was in stark contrast to how heterosexual employees were treated after a death in the family;

- Placing Ms. Romano and Alys Fraser (also gay) in the same sample group for a "Diversity and Inclusion" survey; and

- A staff person in the law department commenting, "[I] Can't stand that dyke on the motorcycle."

143.    Defendant was motivated to treat Ms. Romano in a disparate manner and to discriminate against her because of her gender and sexual orientation, and such discriminatory treatment of Ms. Romano was in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

144.    Non-gay employees and male employees were not subjected to similar treatment.

145.    In discriminating against Ms. Romano in violation of the law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Romano.

146.    Ms. Romano has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, depression, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

147.    Due to the conscious disregard for Plaintiff's statutorily protected rights, and the severity of Defendant's conduct, Plaintiff is also entitled to punitive damages.

**COUNT FOUR –**
**RETALIATION AND TERMINATION IN VIOLATION OF**
**THE VIRGINA HUMAN RIGHTS ACT/VIRGINIA VALUES ACT**

148.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

149.    Ms. Romano was retaliated against because she reported and complained of discrimination and unfair treatment against her based on her gender and sexual orientation, in violation of Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq*.

150.    Ms. Romano reported and complained about discrimination on several occasions throughout her employment, starting in 2014 when she objected to Mr. Schnell's treatment of her.  After Ms. Romano stood up to Mr. Schnell and told him he could not treat her in that manner, Verisign (including through Mr. Schnell) retaliated against Ms. Romano.

151.    Acts of retaliation included:

- Promoting Joy Morel, Ms. Romano's direct peer who is not gay, over Ms. Romano and making her Ms. Romano's new manager, even when Ms. Morel openly admitted she did not know how to do what Ms. Romano did, and confided that she did not know why Ms. Romano was reporting to her;

- Mr. Schnell no longer meeting with Ms. Romano;

- Mr. Schnell talking about Ms. Romano in a negative manner to Ms. Morel;

- Mr. Schnell and others circumventing  Ms. Romano and working directly with her direct reports without involving either Ms. Romano or Ms. Morel  (which Ms. Romano reported to HR and asked that it stop);

- Refusing to approve Ms. Morel's "4" rating (Exceeds Expectations) on Ms. Romano's annual review, and lowering it to a "3" (Achieves);

- Mr. Schell encouraging his Chief of Staff, Min Leone, to circumvent Ms. Romano and communicate with her team behind Ms. Romano's' back;

- Mr. Schnell failing and/or refusing to conduct 1:1 meetings with Ms. Romano, including at times when Ms. Romano was in Mr. Schnell's direct reporting line;

- Mr. Schnell excluding Ms. Romano from meetings he held with his team of direct reports;

- Mr. Reed and Mr. Schnell failing to provide measurable and defined goals for Ms Romano, and then downgrading her for not meeting her goals;

- Mr. Schnell promoting Min Leone to Senior Director (and Ms. Romano's new manager, despite Ms. Romano being more qualified for the position) after asking for Ms. Romano's input and after Ms. Romano told him that Ms. Leone did not understand or have experience in channel marketing (Ms. Romano's job), and asked that she not be made to report to Ms. Leone since Ms. Leone did not understand Ms. Romano's job;

- HR refusing to correct or adjust the amount of Ms. Romano's bonus which had been based on a demonstrably false comment by Mr. Schnell that Ms. Romano had missed a deliverable, and taking no action to address Ms. Romano's written complaint, and instead pressuring her to handle the situation with Mr. Schnell on her own, write down her comments, and "sign off" on the year-end review; and

- Refusing to approve Ms. Romano's requests to travel to meet with the European team for an in-person workshop program.

152.    Ms. Romano was subjected to further retaliation when, after she was summoned to HR in May 2016 and asked whether she displayed and posted pictures of her and her wife, and was admonished that she did not want to be viewed as "recruiting" people to be gay, she told HR that her photos were no different than her heterosexual co-workers displaying or posting pictures with their spouse, and refused to take them down.

153.    Subsequent, and further, retaliation included:

- Subjecting Ms. Romano to a write-up and HR investigation based on false allegations of being disrespectful to her manager and not following the Code of Conduct;

- Changing Ms. Romano's working hours, which had been arranged years ago to allow her to accommodate early morning meetings with the international teams;

- Micromanaging Ms. Romano while simultaneously telling her to "own everything;"

- Subjecting Ms. Romano to undue scrutiny and blaming Ms. Romano for errors that were clearly not hers;

- Excluding Ms. Romano from meetings held with her direct reports in Mr. Schnell's office, and not informing Ms. Romano of the meetings or the work being done;

- HR failing to acknowledge or address Ms. Romano's complaints of being excluded and undermined with her direct reports;

- Awarding Ms. Romano the lowest merit increase (1.5%) and the lowest RSU award grant given for her 2016 annual review;

- Failing to properly address or investigate Mr. Malakoff's aggressive and threatening behavior toward Ms. Romano, and failing to take any steps to protect Ms. Romano after being on notice that Mr. Malakoff was boasting around the office that he had put Ms. Romano "in her place," was making inappropriate, derogatory, discriminatory, homophobic and anti-gay comments, and was watching for Ms. Romano's motorcycle to see when she arrived or left the building;

- Requiring Ms. Romano to remain as Mr. Malakoff's supervisor and interact with him despite his aggressive behavior and threats against her;

- Failing to adjust Ms. Romano's salary when she was moved to a new role (Director of Marketing Operation and Measurement) with a higher pay scale (and when her current salary level was less than the pay scale for her new position), despite her requests and follow-up; and

- Selecting Ms. Romano, in October 2018, for a 360 evaluation and denying her request that Mr. Schnell and Ms. Leone not be included.

154.   In or around November/December 2018, Ms. Romano again reported the continuing discriminatory and retaliatory behavior towards her.

155.   Subsequent, continuing acts of retaliation included:

- Mr. Schnell unilaterally changing a "4" rating Ms. Romano had given to one of her female direct reports, to a "3," once again undermining Ms. Romano's authority with her team;

- Subjecting Ms. Romano to a written write-up for telling her employee that Mr. Schnell had downgraded her rating, when others were not similarly written-up for the same conduct;

- Investigating Ms. Romano as the result of an (alleged) ethics line complaint against her for talking about having "gay sex" with her wife "all over [her] house;"

- Subjecting Ms. Romano to multiple write-ups for fabricated allegations such as a false allegation that she stormed out of a meeting;

- Requiring Ms. Romano to work with an executive coach after Ms. Romano stated she would not quit or back down from defending herself; and

- Terminating Ms. Romano and not extending her employment through the summer (as Verisign did for others, such as Scott Schnell and Min Leone in order to allow them to receive vesting stock options and additional bonuses) and cancelling Ms. Romano's forthcoming RSU grants.

156.    Defendant was motivated to treat Ms. Romano in a disparate manner and to retaliate against her because she engaged in the protected activity of complaining about being discriminated against on account of her gender and sexual orientation.

157.    Such retaliation was in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq*.

158.    In retaliating against Ms. Romano in violation of the law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Romano.

159.    Ms. Romano has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, depression, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and

advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

160.    Due to the conscious disregard for Plaintiff's statutorily protected rights, and the severity of Defendant's conduct, Plaintiff is also entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff MICHELLE ROMANO requests that this Court enter judgment in her favor, and against the Defendant VERISIGN, INC., on the above stated Counts; and further:

(a)    Award Ms. Romano compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on the above-stated Counts One through Four; and in addition

(b)    Award punitive damages to Ms. Romano on Counts One through Four in the amount of $350,000 (the statutory cap in Virginia); and in addition

(c)    Award Ms. Romano attorneys' fees and the costs of this action; and in addition

(d)    Award injunctive relief consisting of an order prohibiting Defendant from engaging in further employment practices that create or tolerate a discriminatory and retaliatory work environment; and in addition

(e)    Award Ms. Romano such other and further relief as may be appropriate under the circumstances.

**<u>JURY DEMAND</u>**

PLAINTIFF MICHELLE ROMANO DEMANDS A TRIAL BY JURY.

May 13, 2022                                    Respectfully submitted,

*/S/  CARLA D. BROWN*
Carla D. Brown, VSB No. 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
  BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Michelle Romano*