IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHELLE ROMANO,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        Civil Action No. 1:22-cv-00549(AJT/IDD)
                                    )
VERISIGN, INC.,                     )
                                    )
            Defendant.              )
_____)

## MEMORANDUM OPINION AND ORDER

On May 13, 2022, Plaintiff Michelle Romano filed this action against Defendant Verisign Inc. (hereinafter "Verisign") pursuant to Title VII of the Civil Rights Act of 1964 and the Virginia Values Act, Va. Code. Ann. § 2.2-3905(B)(1).  In her Complaint, [Doc. No. 1], Romano alleges that her former employer, Verisign, discriminated against her, retaliated against her, and created a hostile work environment based on her gender and sexual orientation. Verisign has filed a Motion for Summary Judgment ("the Motion") [Doc. No. 40]. A hearing was held on the Motion on December 28, 2022, following which the Court took the matter under advisement.

Upon consideration of the Motion, the memoranda in support thereof and in opposition thereto, the arguments of counsel at the hearing, and for the reasons set forth below, the Motion is GRANTED.

### I. Factual Background

Verisign provides domain name registrations and internet infrastructure, with a headquarters located in Reston, Virginia. [Doc. No. 1] at 2. Plaintiff Romano, a resident of Fairfax County, Virginia, began her employment with Verisign in September of 2009. *Id.* at 2, 4. Briefly summarized, the Complaint alleges the following:

In 2013, Romano was appointed as the Director of Channel Marketing by one of Verisign's Senior Vice Presidents, Scott Schnell. [Doc. No. 41] at 5. Commensurate with her promotion, Romano was given a salary increase and was awarded stock options in the company. *Id.* Romano contends that her salary increase was less than the standard 10% salary increase that was customarily awarded by Verisign to heterosexual males. [Doc. No. 58] at 4. Romano continued to work under Schnell from 2013-2015. *Id.* During this period, Schnell provided feedback to Romano as part of her employee evaluations; and Romano contends that certain comments Schnell made in these evaluations evidenced a discriminatory disposition based on her gender and sexual orientation. [Doc. No. 58] at 10. Among these alleged comments are that Romano "[a]t times needs to moderate her passion, step back, and she will develop both deeper partnerships, and greater strategic depth"; that she needed "to be less alpha, to be less passionate"; and that she was "too aggressive." *See* [Doc. No. 58] at 10. Romano alleges that in 2014, Schnell hired another individual to be Romano's supervisor to act as a buffer between Schnell and Romano. *Id.* at 10-11.

In 2015, a heterosexual female was appointed as Romano's new supervisor, [Doc. No. 41] at 9, and over the next two years, there was a series of disputed events that occurred between Romano and other Verisign employees. In that regard, Romano claims that one of her subordinate employees made homophobic comments[1] about her and that several employees made false allegations that she was threatening and insubordinate. *See generally* [Doc. No. 58] at 12-13. Romano also alleges that she reported complaints about Schnell's cursing at her during a meeting, but despite her complaint, Schnell received no discipline. *Id.* at 13. Romano also contends that in May 2016, Romano was told by Heather Serice, a senior director in Verisign's human resources

---

[1] The alleged homophobic comment is that Romano shared "personal information other than just health issues with others at work that made people feel uncomfortable- lifestyle choices, e.g." [Doc. No. 61-2] at 2-3.

department, to remove photographs of her wife from her desk so that Romano would not be seen as "recruiting." [Doc. No. 1] at 10.

In 2017, Romano was transferred to a new position within Verisign. *Id.* at 11. In this position, Romano reported to Don Chapman until 2018 when she again reported to Schnell until March 2019, at which time Michael Reed became Romano's supervisor after Reed was promoted. *Id.* In March 2019, one of Romano's subordinates submitted a complaint that Romano had divulged information about private individual performance ratings and that Romano had discussed having sex with her wife. *Id.* at 10. Romano denies that she made any comments about having sex with her wife and defended her actions on the grounds that discussions about individual performance ratings were not kept confidential as a matter of course within Verisign. [Doc. No. 58] at 10-11. In 2019, Verisign hired an executive coach for Romano, an action which Romano welcomed at the time. [Doc. No. 41] at 13; [Doc. No. 58] at 17.

In 2020, Verisign initiated a structural reorganization[2] that included eliminating redundant employee positions. [Doc. No. 41] at 15. The reorganization efforts were led by Ebrahim Keshavarz, Senior-Vice President of Product Management, who identified ten positions that should be eliminated in the reorganization as redundant, including Romano's. *Id.* The reorganization was implemented in 2021 and Romano and the nine other employees' positions were terminated effective June 1, 2021. [Doc. No. 66-1] at 8 ("All the U.S. employees' final day was June 1st, 2021.").

Romano filed this action on May 13, 2022 after exhausting her administrative remedies. [Doc. No. 1]. The four-count Complaint alleges: (1) discrimination and creating a hostile work environment in violation of Title VII; (2) retaliation for protected activity in violation of Title VII;

---

[2] This reorganization is variously referred to in the deposition testimony of various Verisign employees as a Re-Org, a Reduction in Force, and a RIF.

(3) discrimination in violation of the Virginia Values Act; and (4) retaliation in violation of the Virginia Values Act. Verisign has moved for summary judgment on all claims. [Doc. No. 40].

## II. Legal Standard

A party may move for summary judgment by identifying either a claim or defense, or a part of a claim or defense, on which summary judgment is sought. Federal Rule of Civil Procedure 56(a). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact." *Id.* A party opposing a motion for summary judgment must point to specific factual evidence to show that a genuine dispute of material fact exists, and that summary judgment should not be granted in the movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 477 U.S. at 247-248). A non-movant's conclusory assertions and denials are not sufficient to preclude an award or summary judgment for the movant. *See Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citations omitted).

## III. Analysis

Title VII creates liability for employers who discriminate based on the "race, color, religion, sex or national origin" of their employees. 42 USC §2000e-2(a)(1). The Virginia Values Act makes it unlawful to discriminate against an individual based on, *inter alia*, "race, color, religion, sex, sexual orientation, gender identity..." Va. Code. § 2.2-3905(B)(1). In support of her claims under both statutes, Romano argues that (1) she was subjected to multiple discrete

discriminatory acts which reflect disparate treatment of or retaliation against her, and (2) she was subjected to a hostile work environment based on Romano's sex or sexual orientation.[3]

### A. Plaintiff's discrimination and retaliation claims.

#### (1) Romano's termination is the only adverse employment action within the applicable limitations period.

Given the applicable limitations period, the Court has previously ruled that Romano's claims for discrimination or retaliation must be based on adverse actions alleged to have occurred after September 24, 2020.[4] *See* [Doc. No. 25] (Order on the Motion to Dismiss). An adverse action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998).

Verisign argues that the only adverse action that occurred after September 24, 2020 was Romano's termination. [Doc. No. 41] at 18. Romano argues that three other acts that occurred after September 24, 2020 were adverse actions sufficient to support her disparate treatment or retaliation claims: (1) Schnell's refusal to provide Romano with SMART goals; (2) a false allegation that

---

[3] Within the Fourth Circuit, sexual orientation discrimination is not actionable under Title VII. *See Wrightson v. Pizza Hut of Am.*, 99 F.3d 138 (4th Cir. 1996); *Murray v. N. Carolina Dep't of Pub. Safety*, 611 F. Appx. 166 (4th Cir. 2015); *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 816 (E.D. Va. 2016). Throughout Romano's Complaint, her testimony, and briefing, there is no clear indication of what acts are allegedly attributable to discrimination based on her gender versus sexual orientation. *See e.g.* [Doc. No. 58-1] at 9. Nevertheless, the Court has considered all alleged discriminatory acts applicable to Romano's disparate treatment, retaliation, and hostile work environment claims based on both types of discrimination.

[4] The limitation period for claims made pursuant to Title VII is 180 days from the alleged unlawful employment practice, but this period is "extended to 300 days when state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007); *see also* 42 USC § 2000e-5(e)(1).

Romano stormed out of a meeting; and (3) her coworkers' purported failure to send flowers to Romano when a close family member died. [Doc. No. 58] at 35.

As an initial matter, Romano's own testimony places both the false allegation concerning her leaving a meeting and the failure to have flowers sent as having occurred in 2019, outside of the relevant time period. [Doc. No. 58-1] at 66, 80. In any event, neither the failure to send flowers nor the allegation about leaving a meeting constitutes a discrete adverse action that would support a claim for discrimination or retaliation, as there is no evidence that these acts led to any adverse consequences in her employment. As for the third alleged discrete adverse action, failure to provide SMART goals,[5] there is no evidence in the record that she experienced any adverse consequence for not having the SMART goals she contends she should have received, including either a failure to receive any promotion she would have qualified for or her eventual termination.

For these reasons, there are no disputed material facts with respect to her disparate treatment or retaliation claims based on these three discrete events; therefore, Verisign is entitled to judgment as a matter of law with respect to any of Romano's claims based on these discrete acts. Accordingly, the 2021 termination is the only adverse employment action that could potentially create liability for disparate treatment or retaliation.

---

[5] Romano's complaint about SMART goals is that "what I was being given were not goals that were written in that manner, and so I had to work with [Romano's then supervisor, Min Leone] on numerous occasions and numerous back and forth with edits to try to actually establish SMART goals[,]" that Romano's goals were "not subjective" and "open-ended" and that this led to her not having "proper goals." [Doc. No. 58-1] at 20-21. But as Michael Reed explained without contradiction, Verisign's actual policy is for employees to write their own SMART goals and then for their supervisor to accept or reject those goals. [Doc. No. 66-3] at 6-7. As a result, Romano's subjective belief that her supervisor should have provided a specific type of goal is insufficient to establish that her employer discriminated against her. Likewise, other than Romano's subjective belief, there is no evidence sufficient to find that any other employees had different SMART goals or had SMART goals established in a materially different manner. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (quotations omitted); *Harris v. Rumsfeld*, 428 F. Supp. 460, 466 (E.D. Va. 2006) (The self-assessment of the plaintiff is not relevant to a failure to promote analysis as the plaintiff cannot create their own criteria for qualification) (citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005)).

### (2) *There is no nexus between the 2021 termination and any discrimination or retaliation.*

#### (a) *Plaintiff's discrimination claims*

A plaintiff may establish discrimination through either direct evidence or by using the *McDonnell Douglas* burden shifting framework. *Young v. UPS*, 575 U.S. 206, 213 (2015). To establish her discrimination claims under either method of proof, Romano must establish the required causal connection or nexus between any of the allegedly discriminatory comments or actions and Verisign's decision to terminate her. *See Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999) ("To survive summary judgment on the basis of direct and indirect evidence, [plaintiff] must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action.") As discussed below, the relied upon remarks and conduct occurred years before Romano's termination and are attributed to individuals who took no part in the decision to terminate her. *See id.* (noting a "few isolated statements indicating sexist attitudes" did not allow a claim to survive summary judgment when there was no connection to the plaintiff's demotion and termination); *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (holding that to show discrimination there must be a nexus between the ultimate decision maker and the employment decision) (references omitted). None of the evidence that might be considered either direct[6] or indirect evidence[7] of a discriminatory act or motive would allow a reasonable factfinder to attribute

---

[6] This direct evidence arguably included Schnell's yelling at Romano during a 2014 meeting that Romano believes was done because of her gender, [Doc. No. 58-1] at 41, Schnell's comments about Romano being "alpha" or "dominant" in her interactions with coworkers, [Doc. No. 58-1] at 10, Serice's directive to take down pictures of Romano's wife, [Dkt. 58-1] at 25, and aggressive behavior and comments that were made by Malakoff, an employee who Romano supervised. [Doc. No. 58-1] at 39-40; [Doc. No. 58-3] at 5-7.

[7] Romano's indirect evidence under the *McDonnell-Douglas* test appears to include her claim that she was given smaller raises and compensation following promotion as compared to purportedly similarly situated men at Verisign. [Doc. No. 58-1] at 6. In support of this claim, Romano points only to her own testimony that three male employees told her that they had received raises of "around ten percent", but Romano does not identify what their salaries were, what their positions at Verisign were, what promotions they received, or generally why they are appropriate

the alleged discriminatory animus to the decision maker who selected Romano's position for termination.

The 2020 reorganization resulted in the elimination of ten management positions, which then were held by five men and five women, Plaintiff being one of the five women. That reorganization that led to Plaintiff's termination was based on the analysis and recommendations of Eb Keshavarz, who at the time served as Senior-Vice President of Product Management. [Doc. No. 41] at 14 ¶ 52. As he testified at his deposition, "the first step in the process was to figure out the busines goals of the potential realignment and what the optional structure would be for the organization going forward, and that was a discussion between myself and Todd Strubbe, who was my boss." [Doc. No. 66-1] at 5-6. In that regard, the marketing at Verisign was previously divided into three different geographical regions and Romano's primary role was to "coordinate the international roadmap and support the international marketing teams." [Doc. No. 41-2] at 11. The reorganization attempted to centralize all the marketing within Verisign, thereby making Romano's role unnecessary. *Id.*

Keshavarz testified that the only input he received about which marketing positions to eliminate was from his supervisor, Todd Strubbe, [Doc. No. 66-1] at 6, that he did not receive any input from Human Resources or any other individual, including Scott Schnell, about what positions would be eliminated during the reorganization, [Doc. No. 66-1] at 6; [Doc. No. 58-13] at 4, and that he was not told anything about Romano's work performance or details of her employment at Verisign prior to his decision to eliminate her position. [Doc. No. 41-2] at 16. *See Coggins v.*

---

comparators. [Doc. No. 66-1] at 3-6; *See Rodriguez v. Elon Univ.*, 751 Fed. Appx. 395, 397 (4th Cir. 2018) (per curiam) (A "comparator must be similarly situated to a plaintiff in all material respects" quoting *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010)); *see also* [Doc. No. 58-4] at 6 (Schnell testifying that a typical salary increase is between one and four percent); [Doc. No. 41-7] at 3 (Verisign's affirmation that there is no practice of awarding standard 10% raises with promotions and that instead, raises are determined based on a variety of factors.)

*Government of Dist. Of Columbia*, 1999 U.S. App. LEXIS 2603 at *10 (4th Cir. 1999) (Evidence of a supervisor's discriminatory remarks did not impute discriminatory motives to the ultimate decision maker who terminated an employee plaintiff). Keshavarz further testified that after he recommended positions to be eliminated, all those positions were subsequently eliminated. [Doc. No. 66-1] at 7. In sum, Keshavarz's uncontradicted testimony is that he had no knowledge of Romano's sexual orientation or knowledge that she had engaged in any sort of protected activity.

Romano does not contend that Keshavarz had any relevant knowledge about her sexual orientation or protected activity. Rather, she argues that Keshavarz was not the ultimate decision-maker, his recommendations had to be adopted by Verisign "leadership," and because Verisign "leadership" was aware of her complaints about discriminatory treatment, it can be inferred that the ultimate decision-maker, Strubbe, by virtue of his being part of Verisign leadership, also had that relevant knowledge. However, as with Keshavarz, there is no evidence that before Strubbe approved Keshavarz's recommendations, Strubbe was aware of Romano's sexual orientation or that she had engaged in any protected activity. Nor is there any evidence, other than Romano's uncorroborated belief, that the Human Resources department was also involved in the termination decision. There is also no evidence that before Strubbe approved Keshavarz's recommendations, Strubbe had any conversations about Romano's sexual orientation or protected activity with either Verisign's Human Resource's department[8] or the coworkers who allegedly engaged in the

---

[8] In support of her contention that the Human Resources Department was involved in the decision to include her position for elimination in the reorganization, Romano points to the deposition testimony of human resources representative Paul Rowson. However, Rowson only stated that he was part of the meeting where Romano was informed of the decision that her position was eliminated, not that he was involved in the decision to eliminate her position. [Doc. No. 58-3] at 22. Similarly, Keshavarz testified that a human resources department member (specifically Heather Serice) was only involved with determining what positions were eliminated within the human resources department and then for planning *after* the new corporate structure was selected. [Doc. No. 66-1] at 5-6. Overall, Romano has not presented any evidence, outside of her own belief and conclusory testimony, that the human resources department gave any input into what positions would be eliminated in the marketing department or that the decision to either initiate the reorganization or to select certain positions for elimination involved individuals with knowledge of Romano's sexual orientation or protected activity. *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142-

discriminatory treatment of Romano. Further, an equal number of men and women were selected during the reorganization, and accordingly there is no evidence upon which to infer discrimination based on gender in connection with the elimination of positions. Nor is there any evidence from which a factfinder could conclude that employees' positions were selected for removal based on sexual orientation. *See e.g. Dugan v. Albermarle County School Board*, 293 F.3d 716, 720-721 (4th Cir. 2002) (In the context of a reduction in force, discrimination is proven when a plaintiff can show a protected status was not treated neutrally or by other circumstances). Accordingly, there is no evidence to establish any discriminatory intent by Keshavarz or Strubbe.[9]

### (b) *Plaintiff's Retaliation claims*

Plaintiff has likewise failed to proffer facts sufficient to establish the required causal connection between any alleged act of retaliation and her termination. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006). Although this connection can be shown through temporal proximity or relevant circumstantial evidence, *see Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021), the most recent purported protected activity[10] that Romano claims she engaged in appears to have happened in 2019, nearly two years before Romano's termination. This period of over a year is too long to support an inference of a causal connection based on temporal proximity. *See Causey*, 162 F.3d 795, 803 (4th Cir. 1998) (thirteen months between protected activity and discharge does not lead to an inference that termination was retaliation) (*ref., Dowe v. Total Action Against Poverty in*

---

143 (4th Cir. 2007) (holding a plaintiff's general statements "standing alone, are insufficient to sustain an actionable Title VII claim.") (*ref., Causey v. Balog*, 162 F.3d 795, 801-802 (4th Cir. 2007)).

[9] As discussed with respect to Romano's claim of pretext, the evidence in the record also does not establish, as Romano contends, that Romano's position was filled by an individual outside of her protected class. *See infra* at 13-14; *see also Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998) ("In order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class").

[10] It is not clear what specific protected activity Romano claims she engaged in, as she alternatively refers to complaints she made in 2016, [Doc. No. 58-1] at 68, and meetings with Human Resources representatives in 2019 in response to complaints made about her. [Doc. No. 58-1] at 57; [Doc. 41-1] at 67. Defendant contends that Romano did not engage in any protected activity, or if she did, she has not identified when.

*Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). And as with her discrimination claims, there is no other evidence from which a causal connection can be inferred to be possessed by the relevant decision maker.

> **(3)** ***There is no evidence from which a factfinder could conclude that Verisign's legitimate non-discriminatory and non-retaliatory reason for Romano's termination is pretextual.***

If the plaintiff successfully carries her burden of establishing a prima facie case for retaliation or discrimination, then the burden shifts to the employer who must prove that it had a legitimate non-discriminatory and non-retaliatory reason for the adverse employment action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (holding that after a *prima facie* case is made, a defendant may demonstrate a non-discriminatory reason for an adverse employment action); *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018) (finding that following a *prima facie* case of retaliation, the burden shifts to the employer to demonstrate a non-retaliatory reason for the disputed action). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Dawson v. Washington Gas Light Co.*, No. 19-2127, 2021 WL 2935326, at *4 (4th Cir. July 13, 2021) (internal quotations and citation omitted). In presenting a legitimate, non-discriminatory or non-retaliatory reason for a plaintiff's termination, a defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affs.*, 450 U.S. at 254. Instead, the defendant's "explanation provided must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. And the defendant's reason must be both "clear and reasonably specific" to satisfy its burden of production. *Id.* at 258. If the employer carries this burden, then the plaintiff must establish by a preponderance of the evidence that the legitimate reasons offered by the defendant-employer were not its true reasons but were rather a pretext for discrimination or retaliation. *Id.* at 253; *see also Foster v. Univ. of Maryland-*

*Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015) ("We conclude therefore, that the *McDonnel Douglas* framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action.") Importantly, "[d]espite this burden-shifting framework, the ultimate burden of persuading the trier of fact remains with the employee at all times." *Dawson*, 2021 WL 2935326 at *4 (internal quotations and citation omitted).

Pretext can be found even within the context of a legitimate reduction in force. *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 340-341 (4th Cir. 2002) (determining even for a legitimate reduction in force, a plaintiff may show that the reason they were included in the reduction was pretext for discrimination) (*ref.*, *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 557 (7th Cir. 2001)); *see also Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536-537 (6th Cir. 2014) (holding a plaintiff is required to provide evidence they were singled out for impermissible reasons when their discharge was the result of a reduction in work force and the position was not filled by another employee). But to do so, a plaintiff must establish the pretextual reason for her specific inclusion in the reduction in force. *See Corti*, 304 F.3d at 340-341, *citing with approval Rummery*, 250 F.3d at 557 (explaining that "even if a reduction in force is otherwise legitimate (i.e. not simply an excuse to terminate [female] workers), a plaintiff may establish pretext by showing that the specific reasons given for including [her] in the reduction were pretextual.")

Verisign asserts that Romano's termination was part of a "reduction in force" after a company reorganization made several positions in the company redundant, a clearly legitimate, non-discriminatory and non-retaliatory reason for her termination. [Doc. No. 41] at 19. Even assuming that Plaintiff has proffered evidence sufficient to make out a prima facie case of either discrimination or retaliation, which she has not, she has also failed to proffer evidence sufficient

to infer that Verisign's asserted reason for her termination was a pretext for discrimination or retaliation against her.

In support of her claim of pretext, Romano points to a written summary of Romano's 2019 interview by the human resources department after Jennifer Walther, an employee Romano supervised, made complaints about Romano's comments at work. [Doc. No. 61-4]. At the end of that written summary is a handwritten note that reads "Considerations 1) Move/protect Jen 2) Re-org or RIF -what would Romano role be." *Id.* at 4. Romano argues that this written summary, together with her own testimony, establishes that Verisign's entire 2021 restructuring, and the termination of nine other employees, was essentially initiated as a cover to terminate her position. [Doc. No. 58] at 35. There is no evidence that shows that this document, created in 2019, was considered or had any role in instituting or implementing the reorganization. Without any evidence to the contrary, Keshavarz flatly denies that he considered any input from Verisign's human resources department, which authored the document in question, before making the decision to eliminate Romano's position. [Doc. No. 66-1] at 6; [Doc. No. 58-13] at 4. In sum, there is no evidence that any relevant decision maker knew of, relied on or was influenced by this document.

Relying in part on Keshavarz's testimony, Romano also claims that the reduction in force was pretextual because (1) Jennifer Walther, her former subordinate, a heterosexual female, was promoted to take over Romano's duties and (2) Schnell was permitted to continue working at Verisign after the restructuring. [Doc. No. 58] at 21, 34.

With respect to Walther's promotion and Romano's contention that she assumed Romano's former role, Keshavarz testified only that Walther received a promotion some months after the reduction in force. [Doc. No. 58-13] at 6. Beyond this testimony, there is only Romano's own testimony that she understood that Walther began "handling some of [her] job duties" along with

Mike Reed, a senior Verisign employee. [Doc. No. 58-1] at 74. Even if this belief were true, Walther performing some of Plaintiff's duties from her eliminated position is insufficient to allow a reasonable inference of pretext. Similarly, evidence that Schnell accepted a different position at the company after his former position was removed does not allow an inference of pretext because it does not establish that either Schnell's former position or Romano's former position were not made redundant by Verisign's reorganization.[11] In sum, Romano has not provided any evidence other than her subjective beliefs to establish that her termination was a pretext for discrimination or retaliation. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 (4th Cir. 2002) (holding evidence of "subjective beliefs... without more is insufficient to create a genuine issue of material fact as to any discriminatory conduct" on the part of an employer); *Ali v. Maryland Dep't of the Env't*, 1995 U.S. App. LEXIS 4316 at *8 (4th Cir. 1995) (per curiam) ("A subjective belief of discrimination, however genuine, cannot be the basis for judicial relief in an employment discrimination case.")

For the above reasons, there are no genuine issues of material fact and Verisign is entitled to judgment as a matter of law as to all of Plaintiff's discrimination and retaliation claims.

**(B)** *No reasonable factfinder could hold that there was a hostile work environment during the course of Romano's employment.*

Romano next contends based on all the facts alleged that Verisign created a hostile work environment. [Doc. No. 58] at 22. To assert a claim for hostile work environment a plaintiff must show there was "(1) unwelcome conduct; (2) that is based on the plaintiff's sex...; (3) which is

---

[11] Romano also references, presumably also in support of her claim of pretext, that her company stock was not allowed to vest after her termination, and that two other employees whose positions were eliminated, Min Leone and Scott Schnell, were allowed to continue working after the June 1 termination date in order to allow their company stock to vest. Serice testified that she was not involved with any decisions regarding Schnell or Leone after their positions were terminated. [Doc. No 66-22] at 5-6. Keshavarz testified that he did not believe Leone was allowed to continue in her former position after June 1st. [Doc. No. 66-13] at 7. The evidence Romano offers to support this argument only establishes, at most, that Leone may have continued working for Verisign in a different position. [Doc. No. 66-3] at 2. Overall, none of the evidence Romano offers on this point establishes either that heterosexual or male employees were given preferential treatment or that the reason for the elimination of Romano's position was pretextual.

sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (quoting *Mosby-Grant v. City of Hagerstown*, 630 F.3d 325, 334 (4th Cir. 2010)). The underlying behavior that creates a hostile work environment must "be sufficiently severe or pervasive to alter the victim's employment conditions and create an abusive working environment." *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see also Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 209 (4th Cir. 2014) (identifying the issue as whether "the record contains proof from which a reasonable trier of fact could conclude that the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere.") (citing *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009)). To evaluate the severity of the behavior, a district court must consider the perspective of a "reasonable person" experiencing the behavior. *Ocheltree v. Scollon Prods*, 335 F.3d 325, 333 (4th Cir. 2003) (quoting *Oncale v. Sundowner Servs.*, 523 U.S. 75, 82 (1998)).

Romano identifies the following acts that allegedly created a hostile work environment:

(a) "Mr. Schnell's sexually-charged comments during her reviews that Ms. Romano should be "less-alpha" and was "over dominant"

(b) "interrogating, counseling, and disciplining Ms. Romano for communicating her lifestyle choices, which included being gay, to other employees"

(c) "being asked by human resources not to display photos of her wife in her office space to avoid being seen as trying to recruit"

(d) "being grouped with the only outwardly gay female during a diversity inquiry"

(e) "being assigned an executive coach when no heterosexual employees were assigned one and then being informed which coaches were gay and which had gay children"

(f) "being subjected to frequent yelling and cursing from male employees directed only to female employees"

(g) "her termination and not being permitted to allow her stock to vest as Min Leone was, and Mr. Rowson not offering Ms. Romano the opportunity to apply to other positions as other heterosexual employees"

[Doc. No. 58] at 28-29 (internal citations omitted).

The only alleged acts contributing to a hostile work environment within the limitations period are (1) Romano's termination; (2) not allowing her stock to vest; (3) not offering her the opportunity to apply to other positions like heterosexual employees; and (4) being grouped with the only outwardly gay female during a diversity inquiry. All other events alleged in support of her hostile work environment claim occurred outside the applicable limitations period and any claim based on those events would ordinarily be time barred unless part of the same hostile-work-environment claim that occurred within the limitations period. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016) (holding time barred discriminatory acts are only actionable if another is part of the "same hostile-work-environment claim" and "occurred within the limitations period"). Accordingly, in order to establish her hostile work environment claim under a continuing violation theory, Romano must show that a sufficient connection between the relied upon events outside of and within the limitations period. *AMTRAK v. Morgan*, 536 U.S. 101, 118 (2002) (explaining that a plaintiff cannot recover for acts occurring outside of an actionable time period when those acts have no relation to a discriminatory act within the actionable time period); *see also Marvin v. Austin*, 2022 U.S. Dist. LEXIS 43043 at *19 (E.D. Va. March 10, 2022) (holding that unlinked actions taken by different managers more than six months apart could not create a hostile work environment claim) (citations and internal quotation marks omitted).

The alleged hostile acts within the limitations period are not sufficiently connected to the alleged hostile acts outside the limitations period so as to constitute part of a continuing pattern

that created a hostile work environment that altered Romano's conditions of employment. The persons involved and the substance of the conduct are both different. In short, there is no discernable pattern, simply a wide-ranging array of conduct Romano viewed as offensive. *See Jones v. Sun Pharm. Indus.*, 2020 U.S. Dist. LEXIS 85391 at *13-14 (E.D. Va. May 14, 2020) (finding a discrete act must be part of a pattern of discrimination to invoke the continuing violation theory) (citing *Guessous*, 828 F.3d at 223; *AMTRAK*, 536 U.S. at 120 (holding evidence that discriminatory actions were "the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers" could support a hostile work environment claim)); *cf., Mustafa v. Iancu*, 313 F. Supp. 684, 694 (E.D. Va. 2018) ("An incident that has no relation to the other acts cannot be considered as part of the hostile work environment claim.") (internal quotations omitted).

Moreover, the relied upon events outside of the limitations period, even if they occurred as alleged, were not sufficiently "severe" or "pervasive," either individually or collectively, so as to alter the conditions of Romano's employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility' code." (quoting *Oncale*, 523 U.S. at 81)); *see also Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) ("[M]ere utterance of an epithet which engenders offensive feelings in an employee, does not sufficiently affect the conditions of employment to implicate Title VII.") (internal quotations and citations omitted). Nearly all of the relied upon behavior constituted one-time occurrences, or behaviors that only occurred sporadically, over a six-year period and were committed by different employees of different rank within the company. *See Faragher*, 524 U.S. at 23 (holding "offhand comments[] and isolated incidents (unless extremely serious)" do not inherently create a hostile work environment); *McIver v. Bridgestone Americas,*

17

*Inc.*, 42 F.4th 398, 408 (4th Cir. 2022) ("Large temporal gaps suggest occasional problems, not pervasive ones.") And while no doubt viewed as offensive by Romano, they do not constitute the type of action that affected the conditions of Romano's employment.[12] *See, e.g.,* [Doc. No. 41-1] at 30 (Romano's testimony that she was not disciplined or demoted for continuing to display pictures of her wife at the office.);

The only continuing course of behavior that Romano alleges is that her supervisors regularly yelled. But the only specific incident she identified relative to her was a single incident in 2014 when Schnell, her supervisor, yelled at her and used profanity.[13] [Doc. No. 58-1] at 41. But other than Romano's own general testimony as to further incidents, none of which involved any explicit references to her sex or sexual orientation, the only other specific evidence with respect to yelling is that Schnell also yelled at a heterosexual female, [Doc. No. 66-8] (Morel testimony) at 4[14], and another of Romano's supervisors, Mike Reed, had "animated discussions" with Romano two or three times over the course of two years. [Doc. No. 58-5] at 6. Romano's general belief that this yelling occurred based on her gender or sexual orientation, in the absence of specific incidents where the yelling involved discriminatory language, is insufficient to meet the "high bar" necessary to establish a hostile work environment. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-316 (4th Cir. 2008) ("[R]ude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor,

---

[12] These events include the statements during Romano's 2014 review that Romano was too "aggressive" or "passionate," discussion of Romano's "lifestyle choices," telling Romano to hide pictures of her wife, Romano's subordinate's confrontational behavior in Romano's office, and the third-party's internet video that purportedly condoned homophobic behavior. There is no evidence from which a reasonable factfinder could conclude that these events were connected either to each other or to an overall pattern of behavior within Romano's workplace. The record also does not establish how these incidents affected Romano's working conditions, beyond adding to Romano's belief that she was being discriminated against.

[13] Of the incident, Schnell testified that he cursed, but not at a specific employee, and then immediately apologized because he "expressed great remorse for having lost [his] temper." [Doc. No. 58-4] at 16-17.

[14] Morel did not testify, as Romano contends in her opposition, that Schnell only yelled at female employees, but rather she stated that she didn't remember specific times when Schnell yelled at any male employees. [Doc. No. 66-8] at 3.

are not actionable under Title VII.") (internal citations and quotations omitted). Drawing every inference in favor of Romano, Schnell's acrimonious behavior was potentially "unprofessional and inappropriate," but as "as a matter of law, this was not the kind of 'extreme' conduct that creates a workplace so objectively hostile or abusive that it constitutes a change in the terms and conditions of employment." *Sowash v. Marshall of Ma, Inc.*, 2022 U.S. App. LEXIS 17331 at *11-12 (4th Cir. 2022) (holding summary judgment was appropriate when "neither the number nor nature of those [physical] contacts is sufficient to meet the 'severe or pervasive' threshold.") (citations omitted); *see also Bennet v. CSX Transp., Inc.*, 552 Fed. Appx. 222, 227 (4th Cir. 2014) (per curiam) ("It is not the province of Title VII to eliminate every instance of rudeness or insensitivity."); (*Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006) (finding "rude treatment" alone cannot sustain a hostile work environment claim). Further, even if Schnell's behavior could be attributed to Romano's sex or sexual orientation, the record does not reflect any evidence that any yelling is connected to an event after September 24, 2020. As the yelling is not connected to a discriminatory event that occurred within the actionable time period, the general allegation that yelling occurred, on its own, does not establish that an action contributing to a hostile work environment has occurred within the actionable time period.

Romano has also not presented sufficient evidence from which to establish a hostile work environment based on acts within the applicable limitations period. Again, the decision-makers with respect to her termination were not involved in the other hostile acts alleged to have occurred within the actionable time period; and as to other timely relied upon actions, Romano has not offered sufficient evidence that those acts occurred on account of her gender or sexual orientation, or that those events were unwelcome conduct. For instance, while Plaintiff alleges she was placed in a group telephone call with another lesbian woman who worked at Verisign, [Doc. No. 66-1] at

28, there is no allegation or testimony that Plaintiff did not want to be in a group with this woman or that being placed with this woman had any effect whatsoever on her conditions of employment. Similarly, while Plaintiff alleges she was the only person assigned an executive coach at Verisign, her own testimony establishes that she thought the coaching was beneficial and welcome. *See* [Doc. No. 41-1] at 37 ("...I actually enjoyed the coaching. It gave me an opportunity to speak with someone that wasn't internal and that helped me with questions and understanding and coaching on things that I was not - - I did not get from the managers, I didn't get from HR.") And as discussed above, there is no evidence that the failure to provide SMART goals was done on account of Romano's sex or sexual orientation; nor is there any evidence that the alleged failure to have Romano's stock vest or the alleged restrictions on her ability to apply to a new position occurred on account of her sex or sexual orientation. [15]

In sum, Romano has failed to provide evidence from which a reasonable factfinder could find that she was subjected to a hostile work environment during the applicable limitations period.

### V. Conclusion

For the foregoing reasons, there are no material facts in dispute and Defendant Verisign is entitled to judgment as a matter of law as to all of Plaintiff's claims. Accordingly, it is hereby

ORDERED that the Defendant's Motion for Summary Judgment [Doc. No. 40] be, and the same hereby is, GRANTED; and this action is DISMISSED.

---

[15] Although not necessary to the Court's decision, Plaintiff's proffered evidence is also insufficient to establish discrimination based a disparate treatment in connection with the vesting of stock she had already been awarded. *See* [Doc. No. 41-1] at 86 ("Q. Well, were you treated any differently than the others who were let go at the same time? A. I don't know what the others were offered.") Likewise, the record does not support her claim that that she was treated differently than heterosexual males with respect to job opportunities. On that point, Romano only argues that it was "reasonably assumed that Verisign would not rehire Ms. Romano," [Doc. No. 58-1] at 21, based on Rowson telling her during her termination meeting that he would get back to her when she asked whether other positions were available at Verisign, [Doc. No. 58] at 21 ¶ 67; [Doc. No. 58-1] at 86 (Romano testified, "And I said to Eb [Keshavarz] well, isn't there a different position. Because he was going to have product and marketing. And clearly I have the experience to do something else, right. And when I asked him that, Paul Rowson was on that call and he said I'll get back to you about that, he can't answer. That was never answered.")

The Clerk of Court is directed to forward a copy of this Memorandum Order and Opinion to all counsel of record and to enter judgment in favor of the Defendant and against the Plaintiff pursuant to Fed. R. Civ. P 58.

February 7, 2023
Alexandria, Virginia

_____
/s/
Anthony J. Trenga
Senior United States District Judge

21